587 A.2d 485

**Joan Ashley ENNIS**

v.

**Rosalie CRENCA.**

**No. 95, Sept. Term, 1989.**

Court of Appeals of Maryland.

March 26, 1991.

Motion for Reconsideration Denied May 9, 1991.

William L. Fallon, Mt. Airy, for appellant.

Albert D. Brault (Janet S. Zigler, Brault, Graham, Scott & Brault, all on brief), Rockville, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, JJ., COLE * and ADKINS **, JJ. (Retired), and CHARLES E. ORTH, Jr., Judge (Retired, Specially Assigned).

ELDRIDGE, Judge.

The issue in this case involves the scope of employment of a local elected legislative official. The case is before us on appeal from an order of the Circuit Court for Montgomery County dismissing the plaintiff's complaint. Therefore, for purposes of this appeal, the allegations of the complaint must be accepted as true.

---

* Cole, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

** Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

I.

On September 22, 1987, Joan Ashley Ennis met with Rosalie Crenca for lunch in the Montgomery County Council Office Building in Rockville. At the time, Ms. Ennis was President of the Allied Civic Group, Incorporated, a Maryland citizens' group which opposed a controversial development plan for Silver Spring. Ms. Crenca, at the time of the meeting, was a member of the Montgomery County Council. The meeting took place many weeks before the council voted on and approved the development project. Ms. Ennis alleged that her meeting with Ms. Crenca lasted approximately fifteen minutes, during which time she stated the opposition of Allied and another citizens' group, the Silver Spring Traffic Coalition, to the development project. The council vote on the project took place on November 3, 1987, and Ms. Crenca voted in favor of the development project.

Ms. Ennis further alleged that on December 7, 1987, 76 days after the luncheon meeting and long after Ms. Crenca cast her vote in favor of the development project, Ms. Crenca directed Marilyn Piety, "a friend of Crenca's and a budget specialist for the County[,] to contact the news media and accuse plaintiff Ennis of offering Crenca a bribe at the luncheon meeting on September 22, 1987."

On December 9, 1987, Ms. Crenca gave an interview with a reporter from the *Montgomery Journal.* In that interview she accused Ms. Ennis of offering to pay her outstanding campaign debt at the September 22nd luncheon meeting in exchange for voting against the proposed development project. The story of the alleged bribe appeared not only in the *Montgomery Journal,* but also in the *Washington Post* and the *Washington Times.* The following appeared in the *Washington Times* article dated December 10, 1987:

"A bribe? 'That word's not in my vocabulary,' Mrs. Crenca said.

"But, Mrs. Crenca said, Joan Ennis, president of Allied Civic Group and member of the Silver Spring–Takoma Park Traffic Coalition, made a political threat and mone-

tary offer during a meeting in the council building cafeteria on September 22.

"'She said they wanted to support me but if I did not vote their way on this, they would make sure I would never be re-elected again,' Mrs. Crenca said.

"'She said, "Now, we understand you have an unpaid campaign debt ... and if you vote right, we will be glad to pay off your campaign debt,"' Mrs. Crenca said.

"'Her quote was, "This group has deep pockets and there's plenty more where that came from,"' Mrs. Crenca said."

According to newspaper articles attached to the plaintiff's complaint, Ms. Ennis may have informed Ms. Crenca that a vote in favor of the development project would be damaging to her chances for reelection. Nevertheless, Ms. Ennis asserted in the complaint that at no time did she discuss the defendant's campaign debt or offer her any money.

On April 29, 1988, Ms. Ennis was indicted for offering a bribe to an elected officer in violation of Maryland Code (1957, 1987 Repl.Vol.), Art. 27, § 23. On May 27, 1988, the State entered a nolle prosequi in that case.

Ms. Ennis commenced the present action by filing a complaint in the Circuit Court for Montgomery County against Ms. Crenca, seeking money damages based on libel and slander. In Ms. Ennis's complaint, she charged that the defendant made the defamatory statements to the press to discredit the plaintiff and citizen groups who criticized the defendant for her pro-development vote. Moreover, according to an article published in the *Washington Post* and attached to the complaint, Ms. Crenca, at the time she publicly accused Ms. Ennis of offering her a bribe, was being urged to run for Congress.

Ms. Ennis did not name Montgomery County as a defendant, and she did not notify the County of her suit against Ms. Crenca. Ms. Crenca filed a motion to dismiss, asserting that she was acting within the scope of her employment at the time of the alleged defamation and that, therefore, the

Local Government Tort Claims Act, Code (1974, 1989 Repl. Vol., 1990 Supp.) §§ 5–401 through 5–404 of the Courts and Judicial Proceedings Article, applied. Consequently, she argued, Ms. Ennis's failure to notify Montgomery County of her claim in compliance with § 5–404 of that Act required dismissal of the case.[1]

Shortly thereafter, Ms. Ennis filed an amended complaint in which she specifically stated that she was suing Ms. Crenca "individually and not in an official or representative capacity." In addition, Ms. Ennis filed an opposition to the motion to dismiss as well as a motion to waive the notice requirements of the Local Government Tort Claims Act. Ms. Crenca responded that, because of the facts alleged in Ms. Ennis's complaint, Ms. Ennis was necessarily suing the defendant for conduct occurring within the scope of her employment as a county council member.

The Circuit Court for Montgomery County, concluding that the allegations "all evolve[d] from and relate[d] directly to Ms. Crenca's position as an elected official," held as a matter of law that Ms. Crenca was acting within the scope of her employment when she allegedly libeled and slandered Ms. Ennis. The court further held that the plaintiff did not show "good cause" for failing to comply with the notice requirement of § 5–404 of the Local Government Tort Claims Act. Therefore, the circuit court dismissed Ms. Ennis's complaint for her failure to notify Montgomery County of her claim as required by the statute.

---

1. "**§ 5–404. Actions for unliquidated damages.**

"(a) *Notice Required.*—Except as provided in subsection (c) of this section, an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim required by this section is given within 180 days after the injury.

\* \* \* \* \* \*

"(c) *Waiver of notice requirement.*—Notwithstanding the other provisions of this section, unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice, upon motion and for good cause shown the court may entertain the suit even though the required notice was not given."

Ms. Ennis appealed to the Court of Special Appeals, and this Court issued a writ of certiorari prior to argument in the intermediate appellate court. We shall reverse the order of the Circuit Court for Montgomery County.

## II.

The Local Government Tort Claims Act was passed in response to a perceived insurance crisis plaguing counties, municipalities and their employees. The legislative history of the Act reflects the General Assembly's concern for the impact of increased law suits on the incentive of public employees and officials to do their jobs to the best of their abilities. *See* the Department of Legislative Reference's file on Senate Bill 237 of the 1987 Session of the General Assembly.

Section 5-402(a) of the Act imposes on a local government the duty to "provide for its employees a legal defense in any action that alleges damages resulting from tortious acts or omissions committed by an employee within the scope of employment with the local government." Furthermore, that section immunizes local government employees from having judgments executed against them personally for non-malicious tortious acts or omissions committed within the scope of employment.[2] Local governments are

---

2. "**§ 5-402. Nature and extent of legal representation.**
   "(a) *Government to provide legal defense to employees.*—Each local government shall provide for its employees a legal defense in any action that alleges damages resulting from tortious acts or omissions committed by an employee within the scope of employment with the local government.
   "(b) *Immunity; exceptions.*—(1) Except as provided in paragraph (2) of this subsection, a person may not execute against an employee on a judgment rendered for tortious acts or omissions committed by the employee within the scope of employment with a local government.
   "(2)(i) An employee shall be fully liable for all damages awarded in an action in which it is found that the employee acted with actual malice.
   "(ii) In such circumstances the judgment may be executed against the employee and the local government may seek indemnification

required to pay judgments awarded in actions against their employees for tortious acts or omissions committed within the scope of employment.[3] An important provision of the Act, § 5–403(a), states that "[t]he liability of a local government may not exceed $200,000 per an individual claim, and $500,000 per total claims that arise from the same occurrence for damages resulting from tortious acts or omissions, including liability arising under subsection (b) of this section."

As previously indicated, the Act also requires that a local government be notified within 180 days of the injury as a condition precedent to bringing suit against that government or against one of its employees. Notice may be waived where good cause can be shown for not filing notice and where the defendant is not prejudiced by a failure to give notice. Notice is not required where an action is based on alleged conduct outside of the employee's scope of employment because, under §§ 5–402 and 5–403, the statute is applicable only to "tortious acts or omissions

---

for any sums it is required to pay under § 5–403(b)(1) of this subtitle."

It appears that § 5–402 requires a local government to defend its employees in actions involving actual malice, but that the government may seek reimbursement from employees of judgments paid in cases where actual malice is found. *See* the Department of Legislative Reference's file on Senate Bill 237 of the 1987 Session of the General Assembly. *See also* § 5–403 set out below. We note that this scheme differs from the Maryland Tort Claims Act relating to State employees, Code (1984, 1990 Cum.Supp.), §§ 12–101 through 12–110 of the State Government Article, which does not apply where a state employee acted with malice. *See Sawyer v. Humphries,* 322 Md. 247, 587 A.2d 467 (1991).

3. "**§ 5–403. Liability of government; defenses.**
  \* \* \* \* \* \*
  "(b) *When government liable.*—(1) Except as provided in subsection (c) of this section, a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government.
  \* \* \* \* \* \*
  "(c) *Punitive damages excepted.*—A local government may not be liable for punitive damages."

committed by an employee within the scope of employment with the local government."

In the present case, as Ms. Crenca is an elected official, she clearly falls within the definition of an "employee" under the Act.[4] Montgomery County, being a chartered county, is a "local government." [5] Whether Ms. Ennis was required to comply with the notice provisions of the Act, therefore, depends on whether Ms. Crenca was acting within the scope of her employment as a Montgomery County Council member when she allegedly defamed Ms. Ennis. Alternatively, if the defendant was acting within the scope of her employment, the issue becomes whether the circuit court erred in failing to waive the notice provision as provided in § 5–404(c).

### III.

In *Sawyer v. Humphries*, 322 Md. 247, 587 A.2d 467 (1991), just decided, we reviewed in some detail the general principles set forth in Maryland cases for determining if an employee's tortious acts were within the scope of employment. Although we shall not here repeat what was said in *Sawyer*, we do point out that the overall test is whether the tortious acts " 'were done by the [employee] in furtherance' " of the employer's business and " 'were such as may fairly be said to have been authorized by him. By "authorized" is not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to' " the employee by

4. "§ 5–401. Definitions.
   "(c) *Employee.*—(1) 'Employee' means any person who was employed by a local government at the time of the act or omission giving rise to potential liability against that person.
   (2) 'Employee' includes: ...
   (ii) An appointed or elected official; ...."

5. "§ 5–401. Definitions.
   \* \* \* \* \* \*
   "(d) *Local government.*—'Local 'Local government' means: (1) A chartered county established under Article 25A of the Code; ..."

the employer. *Sawyer v. Humphries, supra*, 322 Md. at 254–255, 587 A.2d at 470, and cases there cited. Moreover, where an employee's actions are personal, or where the employee is acting to further his own interests, the conduct is normally outside the scope of employment. *Sawyer*, 322 Md. at 256, 587 A.2d at 471.

█ Therefore, in the case at bar, the issue is not whether Ms. Ennis's allegations "evolve[d] or relate[d] directly to Ms. Crenca's position as an elected official." It is whether Ms. Crenca's conduct was in furtherance of the county's business and incidental to it, or, instead, was in furtherance of Ms. Crenca's interests.

Under the allegations of the complaint, Ms. Crenca's conduct appears to have been a political act undertaken for her own benefit. It is difficult to understand how Ms. Crenca could have been fulfilling her duties as a local legislator, or in any way furthering Montgomery County's business, by publicly accusing Ms. Ennis of offering her money to pay campaign debts in order to influence her vote on a controversial development proposal, when the defamatory conduct took place 76 days after the alleged bribe and long after the council's vote. It is more reasonable to infer from the facts alleged that Ms. Crenca's public statements were made to discredit Ms. Ennis and other political opponents in order to protect Ms. Crenca's career as an elected official.

█ Although the Local Government Tort Claims Act was enacted to protect local government employees from excessive litigation, it was not enacted to shield local elected officials from actions involving tortious acts or omissions committed while engaging in personal ventures such as electioneering, campaigning or fund raising meetings to pay off campaign debts. Those activities are undertaken for the sole benefit of the elected official. *See Burdge v. Excelsior Ins. Co.*, 194 N.J.Super. 320, 324–326, 476 A.2d 880, 883 (1984); *Ploen v. Aetna Cas. and Sur. Co.*, 138 Misc.2d 704, 707–710, 525 N.Y.S.2d 522, 525–527 (1988).

In *Burdge,* the plaintiffs, injured in an automobile accident, sued the county clerk, Burdge, alleging that they were injured because he negligently erected his campaign sign. The court held that Burdge's re-election campaign activities were outside of any "business pursuit" and decided, therefore, that his insurer was required to defend him under the provisions of his personal homeowner's insurance policy. Similarly in *Ploen,* a court held that the president of a local union was "not performing his duties" as an official of the union while in the course of campaigning for re-election to his post and that, therefore, his insurer had a duty to defend him in a libel action arising out of his campaign activities. The court in *Ploen,* 138 Misc.2d at 708, 525 N.Y.S.2d at 526, quoting *Burdge,* 194 N.J.Super. at 323–324, 476 A.2d at 882, stated that

> "in our view campaign activities of an office seeker do not constitute business pursuits.... We are satisfied that while these campaign activities may result in the candidate's obtaining a 'profession or occupation,' they cannot themselves be regarded as activities conducted in the performance of that profession or occupation."

In light of the facts asserted by Ms. Ennis, and admitted by Ms. Crenca for purposes of the motion to dismiss, the defendant's alleged false statements to the press are similar to electioneering activities and not to those activities of a legislator furthering the county's business.

Although it may be argued that the public derived some benefit from learning that one of its elected officials was allegedly offered a bribe, there is nothing peculiar to Ms. Crenca's job as a county council member which created that benefit. Her reporting the alleged bribe to the press, and any benefit to Montgomery County citizens which may have resulted therefrom, were not incidental to Ms. Crenca's employment as a local elected legislative official.[6] *Cf.*

6. The report of an alleged bribe to the press is quite different from the report of a bribe to an appropriate government official, such as the Attorney General or the State's Attorney. Whether the latter conduct

*Hutchinson v. Proxmire*, 443 U.S. 111, 128, 99 S.Ct. 2675, 2684–2685, 61 L.Ed.2d 411, 427 (1979) (in holding that the alleged libelous statements published in a congressional newsletter were not privileged, the Supreme Court stated that " '[n]o man ought to have a right to defame others under colour of a performance of the duties of his office. . . . It is neither within the scope of his duty, nor in furtherance of public rights, or public policy.' " (quoting 2 J. Story, *Commentaries on the Constitution* § 863 at 329 (1833))); *Cheatum v. Wehle*, 5 N.Y.2d 585, 593–594, 186 N.Y.S.2d 606, 612, 159 N.E.2d 166, 171 (1959) (in holding that defamatory remarks made by the appointed head of the State Conservation Commission during an after-dinner speech to a group of citizens were not privileged, the court stated that "[t]he speech made by Commissioner Wehle . . . was not greatly different from a speech of a member of the Legislature speaking to his constituents, explaining his votes or berating some of his colleagues which enjoys no privilege outside the legislative halls").

▋ We recognize that, under some circumstances, an elected official may be acting within the scope of his or her employment when making statements to the press. *See, e.g., Kilgore v. Younger*, 102 Cal.App.3d 744, 162 Cal.Rptr. 469, 476–477 (1980), *aff'd*, 30 Cal.3d 770, 180 Cal.Rptr. 657, 640 P.2d 793 (1982). Nevertheless, we do not have such a case before us today. This case involves an alleged false and defamatory statement to the press, made by an elected official for the official's own purposes.

As we have concluded that Ms. Crenca was acting outside the scope of her employment when she allegedly defamed Ms. Ennis, we need not reach the second issue of whether the circuit court erred when it declined to waive the notice provisions under § 5–404(c) of the Act.

JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY REVERSED, AND CASE RE-

---

would be within the scope of employment is an issue not presented here.

MANDED TO THAT COURT FOR FURTHER PRO-
CEEDINGS NOT INCONSISTENT WITH THIS OPIN-
ION.  COSTS TO BE PAID BY RESPONDENT.